***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement admitted into evidence as Stipulated Exhibit #1 as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On 18 June 1996, an employment relationship existed between plaintiff and defendant.
3. On 18 June 1996, defendant was self-insured.
4. Plaintiff's average weekly wage as stipulated in the Pre-Trial Agreement was $677.58, yielding a compensation rate of $451.60 per week.
5. Plaintiff's medicals regarding this claim are admitted into evidence as Stipulated Exhibit #2.
6. Defendant's Answers to plaintiff's Interrogatories and plaintiff's Answers to defendant's Interrogatories are admitted into evidence as Stipulated Exhibit #3.
7. The following Industrial Commission Forms are admitted into evidence as Stipulated Exhibit #4: Forms 18, 19, 61, 33 and 33R.
8. Specific correspondence is admitted into evidence as Stipulated Exhibit #5.
9. Plaintiff's performance evaluations from defendant are admitted into evidence as Stipulated Exhibit #6.
 *********** RULINGS ON EVIDENTIARY MATTERS
The objections contained within the depositions of Dr. Aneysa Sane, Dr. Kent Joseph Nastasi, Dr. Alicia Beal, Dr. Sara Neal, Dr. Michael Aughey and Dr. Stephen Scher are ruled upon in accordance with the applicable provisions of the law and the Opinion and Award in this case.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. In June 1996, plaintiff was a 32 year old female employed by defendant as a surgical technician. These duties required plaintiff to prepare the surgical room including supplies and equipment, assist doctors as necessary, and break down the room after surgery. Plaintiff worked 10-12 hour shifts and had been employed in this capacity from 1991 to 1993 and then again from September 1994 to the present.
2. While working in operating rooms, plaintiff was exposed to significant amounts of aerosolized latex in the form of latex gloves, surgical gowns and masks, worn by all personnel entering the room. The latex gloves contain a powder inside which facilitates putting on and removing the gloves. Each time a pair of gloves is donned or removed, the powder is released into the air. The powder contains latex antigens which then become aerosolized, and may be inhaled by the personnel in the operating room. Plaintiff was further exposed to aerosolized latex in the course of unpacking surgical instruments and supplies which were pre-packed in latex.
3. In 1992, plaintiff began experiencing an itchy, red rash on her hands. She reported the rash to her supervisor who suspected a latex allergy and instructed plaintiff to wear biogel gloves which, while made of latex, contain a gel coating on the inside of the glove which prevents the latex from being released onto the skin or into the air. When plaintiff changed to the biogel gloves, her rash resolved.
4. Plaintiff left her job with defendant in 1992, but returned in 1994. In Spring 1996, plaintiff began to suffer from respiratory problems, itchy eyes, bronchitis and rhinitis. Her symptoms increased as her hours increased. When plaintiff did not work for a few consecutive days, her symptoms decreased. When she returned to work, her symptoms also returned.
5. On 18 June 1996, plaintiff experienced tightening in her chest and difficulty breathing. She was finishing a ten hour shift and was wearing a latex surgical mask. Plaintiff's supervisor sent her to defendant's emergency department. The emergency room physician diagnosed plaintiff as having an acute asthma attack exacerbated by an upper respiratory infection. The nursing notes indicate an increased respiratory rate, wheezing and an inability to speak. Plaintiff was given a steroid inhaler, Albuterol and antibiotics, and was referred to Wake Forest University Family Physicians for follow-up treatment.
6. Plaintiff presented to Dr. Sara Neal at Wake Forest on 19 June 1996. Plaintiff gave a two year history of asthma, and noted that she had spent the previous weekend with her father who smoked cigarettes. Upon examination, plaintiff had no wheezing, crackles or rales, but Dr. Neal diagnosed plaintiff with asthma. Plaintiff gave a poor inspiratory effort upon lung capacity tests.
7. Plaintiff continued to present to physicians at Wake Forest University Family Physicians through 3 July 1996. She received out of work notes for 23 and 24 June. On 27 June, Dr. Alicia Beal gave plaintiff a note informing defendant that plaintiff had been under a doctor's care since 19 June 1996 and was having difficulty wearing a surgical mask. On 3 July 1996, plaintiff was seen by Dr. Neal and it was noted that plaintiff was feeling suffocated when she had to put on a surgical mask. Plaintiff stated that she was off from work through 7 July 1996, and Dr. Neal suggested that plaintiff use that time to practice wearing a mask at home. Dr. Neal cleared plaintiff to return to work on 8 July 1996.
8. From 8 July 1996 through 16 September 1996, plaintiff worked her regular job as a scrub technician in the operating room. Plaintiff worked 15 hours per day, five days per week. During this time plaintiff continuously opened surgical supplies and wore a surgical mask. During this period, whenever plaintiff worked several days in a row, she experienced itchy eyes, runny nose, severe cough, congestion and severe bronchitis. Her symptoms increased in conjunction with an increase in work. Plaintiff testified that her symptoms caused her to miss work on and off during this period.
9. On 27 September 1996, plaintiff began her work day feeling poorly. When she put her surgical mask on, she began feeling a tightness in her chest and informed the circulating nurse of her discomfort. Plaintiff used her inhaler but obtained no relief. Plaintiff felt faint and dropped to the floor. A nurse brought a wheelchair and plaintiff was taken to the emergency department. She was given a breathing treatment and was sent home.
10. Plaintiff called in sick on 28 September 1996, and was told by her supervisor, Leslie Battie, that she needed to take a leave of absence because her continued absences placed her in danger of termination.
11. Plaintiff presented to her family physician, Dr. Stephen Scher, on 30 September 1996. Dr. Scher gave plaintiff a more potent inhaler and a steroid injection. Dr. Scher stated that he gave plaintiff the injection because he believed she was suffering from allergic asthma. Due to plaintiff's problems in the operating room, Dr. Scher wrote plaintiff out of work for a period of three weeks. He also suggested to plaintiff that she practice wearing a surgical mask while at home; however when she did so, plaintiff felt as though she was suffocating.
12. When plaintiff returned to Dr. Scher on 14 October 1996, she reported an episode of wheezing while at home a few days earlier. Dr. Scher opined that plaintiff's attack could be consistent with a reaction from an allergen. Dr. Scher continued plaintiff on the same medication.
13. On 22 October 1996, plaintiff presented to Dr. Scher with a cold, including symptoms of fever, increased mucus production, a cough and a headache. Plaintiff also reported that for a few days previous to the examination her breathing had become worse. Dr. Scher was of the opinion that although plaintiff had been out of work for approximately four weeks, the viral infection could still have exacerbated her asthma even without continuing exposure to the allergen. Dr. Scher extended plaintiff's out of work note to be open-ended depending on plaintiff's condition.
14. Over the next few weeks, Dr. Scher changed plaintiff's medication in an effort to alleviate her symptoms. On 21 November 1996, plaintiff called Dr. Scher and complained of having developed a rash on her hands after using latex gloves.
15. On 11 December 1996, plaintiff returned to Dr. Scher who noted that she had improved to the point of needing to use her inhaler only once in the previous two weeks. Dr. Scher released plaintiff to return to work because her asthma appeared to be under control; however, he stated that she must have access to her inhaler for acute attacks, should they occur.
16. When plaintiff presented Dr. Scher's note to her supervisor, she was informed that she could not be scrubbed out of the operating room to use an inhaler; therefore she could not return to work until she could perform her job without the use of the inhaler.
17. In June 1996, plaintiff had been offered a job as a surgical technician at Forsyth Memorial Hospital due to a shortage of personnel they were experiencing. Plaintiff turned the offer down at that time because the money was not sufficient. In late September or early October 1996, plaintiff agreed to undergo pre-employment screening by Forsyth. During the course of the screening, plaintiff underwent a blood test known as a RAST test which revealed plaintiff had a latex-antibody in her blood. In December 1996, after having been told by defendant that they could not accommodate her restrictions, plaintiff contacted Forsyth about accepting their job offer. She began pre-employment orientation on 16 December 1996, and on 17 December she was informed of the results of the RAST test, and told that the offer of employment was being rescinded.
18. Plaintiff returned to Dr. Scher on 27 December 1996 and told him that she had tested positive for a latex allergy. Dr. Scher refused to release plaintiff to return to work with defendant because of the allergy, and he referred plaintiff to Dr. Aneysa Sane, a board certified pulmonologist.
19. Plaintiff presented to Dr. Sane on 4 February 1997 and reported a history of asthma. Dr. Sane performed skin prick tests which revealed that plaintiff was allergic to ten different items. The skin prick test for latex allergy showed a wheal of 0 (measuring the rise of a bump around the area of the skin prick) and a flare of 20 (measuring the area from the center of the skin prick that shows a reddening reaction to the allergen). Dr. Sane interpreted the results as being negative, but noted that there is no standardized prick skin test for latex and it was possible that their homemade test was falsely negative. Dr. Sane diagnosed plaintiff with probable latex-induced asthma, and she asked that plaintiff forward the RAST results to her for her review. Upon receipt and review of the RAST test, Dr. Sane opined in her notes that, "the strongly positive results indicates that [plaintiff] does have latex-induced occupational asthma. Therefore, she is not able to work in latex containing environment."
20. On 13 February 1997 Dr. Sane wrote a note to defendant that plaintiff had latex-induced occupational asthma and she was prohibited from working in any operating room with latex. In July 1997 defendant offered plaintiff a position in the pharmacy, which plaintiff accepted. Plaintiff began working for the pharmacy on 14 July 1997, at an hourly wage of $10.82.
21. Plaintiff continued to be treated by Dr. Sane. In August 1997, Dr. Sane noted that plaintiff had experienced some difficulty with her asthma when her job at the pharmacy required her to move around the building, but that the problems had been alleviated once her job was changed to involve only duties within the pharmacy itself. Dr. Sane also noted that plaintiff had an asthmatic attack when she was exposed to latex balloons. Plaintiff did not respond to her current medication, but did improve with a three-day course of prednisone.
22. In a note dated 15 January 1998, Dr. Sane reiterated the diagnosis of atopic asthma with latex hyper-sensitivity and continued plaintiff's current medications. She scheduled a follow-up exam in eight months.
23. Plaintiff returned to Dr. Sane on 17 February 1998, after suffering an attack of itching in her eyes, nasal drainage and congestion followed by headache. Plaintiff had been seen at Family Practice prior to the attack, and was concerned about latex exposure at the clinic. Dr. Sane wrote a note to Dr. Neal requesting that in the future plaintiff be given appointments early in the day to minimize her exposure to any latex in the air of the clinic.
24. Plaintiff presented to Dr. Sane on 18 August 1998, and Dr. Sane noted improvement since plaintiff had been working at the pharmacy and was not exposed to latex. Plaintiff was sleeping through the night and using the inhaler "very infrequently." Dr. Sane scheduled the next follow-up in 12 months.
25. Plaintiff returned to Dr. Sane on 12 November 1998, with complaints of itching and burning eyes, difficulty breathing and increased nasal drainage. The symptoms appeared in conjunction with a new carpet being laid in the area of the hospital plaintiff passed through on her way to the pharmacy. Dr. Sane referred plaintiff for a spirometry test. That test revealed no air flow obstruction, but reduced FVC. The inspiratory limb of the flow volume loop showed a cut-off pattern sometimes seen with laryngeal hyperfunction. Dr. Sane diagnosed plaintiff with atopic asthma exacerbated by new carpet fumes, and referred plaintiff to Mr. Michael Blalock, a speech pathologist, in order to test whether plaintiff had laryngeal hyperfunction.
26. Plaintiff returned to Dr. Sane on 26 August 1999. Plaintiff's asthmatic symptoms were "under very good control," although she had some latex exposure in mid-July which caused some respiratory symptoms which resolved in two hours. Dr. Sane assessed plaintiff with atopic asthma with skin test positivity to dust mite, roach, rag mold, Eastern Ten Tree mix and Maple Box Elder mix. She decreased plaintiff's inhaler use and maintained other medications. On 27 August 1999, Dr. Sane wrote plaintiff a letter in which she again noted the possibility of laryngeal hyperfunction and again suggested that plaintiff present to Mr. Blalock for a methacholine challenge.
27. Plaintiff underwent a methacholine challenge performed by Mr. Blalock on 31 August 1999. This test indicated that plaintiff suffers from laryngeal hyperfunction. Laryngeal hyperfunction is a condition which closely mimics asthma. In both conditions there is an inability to breathe. With asthma, wheezing is a symptom that is always present; however, wheezing is not present with laryngeal hyperfunction. Latex-induced asthma usually has other objective signs such as itchy or watery eyes, rhinitis, sneezing and a rash. No such signs are present with laryngeal hyperfunction. Furthermore, asthma will always respond to Prednisone, causing a reduction in symptoms. Laryngeal hyperfunction will not. On x-ray, asthma will show normal or hyper-inflated lungs. Laryngeal hyperfunction will show low lung volume. Asthma will show airflow obstruction on a spirometry exam, while laryngeal hyperfunction will not.
28. Following her review of Mr. Blalock's findings, Dr. Sane changed her original diagnosis from latex-induced occupational asthma to laryngeal hyperfunction. After Dr. Sane changed her diagnosis based on the test results of a speech pathologist without the benefit of an expert opinion from an ear, nose and throat physician, plaintiff dismissed her as her treating physician and sought an expert opinion from Dr. Kent Joseph Nastasi on 22 September 1999. Dr. Nastasi is board certified in internal medicine specializing in allergy and immunology.
29. Dr. Nastasi performed a methacholine challenge, which was negative, and also performed a RAST test which was also negative for a latex allergy. Dr. Nastasi noted that plaintiff did not have any current evidence of bronchial hyperactivity or latex sensitivity, however he diagnosed plaintiff with latex-induced occupational rhinitis and asthma which was currently in remission due to plaintiff's lack of recent exposure, and opined that she was at risk for re-sensitization should exposure recur.
30. Plaintiff was continuously exposed to latex allergens in the course of her employment with defendant over a prolonged period of time. Dr. Nastasi opined that health care workers are at a higher risk of developing latex allergy due to an increase over the prior ten years of health care workers using latex gloves. He further opined that plaintiff's job duties as a surgical technician placed her at an increased risk over that of the general public of developing latex allergy. Dr. Nastasi also reviewed the skin prick test performed by Dr. Sane on 4 February 1997. In the opinion of Dr. Nastasi, the flare of 20 was sufficient to conclude that the test was positive. After reviewing all of plaintiff's medical records, her history of exposure to latex at work, the positive skin test, and the RAST test performed by Forsyth Memorial Hospital, Dr. Nastasi was of the opinion and the Full Commission so finds that plaintiff has latex allergy, that latex allergy can be a cause of occupational asthma and that plaintiff's occupation as a scrub technician for defendant-employer placed her at a greater risk for developing latex asthma or latex-induced occupational asthma over the general public. Dr. Nastasi further opined and the Full Commission finds that plaintiff's occupation was a significant causal factor in the development of her latex allergy and her latex-induced occupational asthma and that her latex allergy and/or latex-induced asthma was due to causes and conditions characteristic of and peculiar to her occupation. Dr. Nastasi also opined and the Full Commission finds that although plaintiff's asthma was in remission, prolonged exposure to latex could still be dangerous for plaintiff due to the risk of re-sensitization.
31. Dr. Nastasi noted that the preferred method of diagnosing laryngeal hyperfunction is to have a laryngoscopy performed by a physician who specializes in ear, nose and throat. Although Mr. Blalock is not a physician and did not perform a laryngoscopy in determining that plaintiff suffered from laryngeal hyperfunction, Dr. Nastasi noted that assuming the diagnosis was correct; given plaintiff's other symptoms, including wheezing, itching and watery eyes, rhinitis, sneezing and rashes, it was "very likely" that plaintiff also suffered from latex-induced asthma concurrently with laryngeal hyperfunction.
32. The Full Commission gives greater weight to the opinion of Dr. Nastasi and the earlier diagnosis of Dr. Sane that plaintiff suffers from latex allergy. The Full Commission finds that plaintiff's work duties for defendant significantly contributed to the development of her latex-induced asthma and resulting respiratory problems and that plaintiff's work duties placed her at an increased risk over that of the general public not so employed of developing a latex allergy and latex-induced occupational asthma. As a result of her latex-induced occupational asthma, plaintiff was totally disabled from working in her prior job as a surgical technician for approximately nine months. As a further result of her latex-induced occupational asthma, plaintiff's wage earning capacity was diminished for approximately two years, as she was forced to accept a lower paying job when she was able to return to work.
33. Plaintiff's earnings in the pharmacy of defendant hospital gradually increased until 18 July 1999, when plaintiff began earning wages equal to or greater than her pre-injury wages.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of regular and prolonged exposure to latex while working for defendant-employer, plaintiff developed latex allergy which caused her latex-induced occupational asthma. Plaintiff's latex-induced occupational asthma was due to causes and conditions characteristic of and peculiar to her employment with defendant and her employment was a significant contributing factor in the development of plaintiff's latex allergy and resulting latex-induced occupational asthma. Plaintiff latex-induced occupational asthma is not an ordinary disease of life to which the general public is equally exposed, and is, therefore, an occupational disease within the meaning of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13).
2. As a result of her latex-induced asthma symptoms, plaintiff was unable to work and perform her prior duties as a surgical technician or work in any other capacity from 28 September 1996 to 14 July 1997. Therefore, plaintiff is entitled to temporary total disability compensation in the amount of $451.60 per week beginning on 28 September 1996 through 14 July 1997 when she returned to work at a reduced wage. N.C. Gen. Stat. § 97-29.
3. As a result of her latex-induced asthma, plaintiff's wage earning capacity was diminished for approximately two years. Therefore, plaintiff is entitled to temporary partial disability compensation equal to two-thirds of the difference between her post-injury wages and her pre-injury wages from 14 July 1997 through 18 July 1999, at which time she began earning wages equal to or greater than her pre-injury wages. N.C. Gen. Stat. § 97-30.
4. Plaintiff is entitled to have defendant pay for all medical treatment she has received or may receive in the future which is related to her latex-induced allergy and which results from latex exposure in her employment with defendant-employer. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff temporary total disability compensation in the weekly amount of $451.60 per week from 28 September 1996 through 14 July 1997. Said award shall be paid in a lump sum, subject to attorney's fees approved below.
2. Defendant shall pay plaintiff temporary partial disability payments equal to two-thirds of the difference between plaintiff's post-injury wages and her pre-injury wages from 14 July 1997 through 18 July 1999. Said award shall be paid in a lump sum, subject to attorney's fees approved below.
3. Defendant shall pay all plaintiff's medical expenses incurred or to be incurred in the future for medical treatment which is reasonably related to her latex-induced asthma for so long as such treatment is reasonably required to effect a cure or provide relief.
4. Defendant shall pay directly to plaintiff's counsel one fourth of the lump sum awards in Paragraphs 1 and 2 above.
5. Defendant shall pay the costs of this action.
This the ___ day of December, 2002.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER